*Proposed DFM GPA Form*

<u>Digital Flare Mitigation Gas Purchase Agreement</u>

This Agreement ("***Agreement***") is entered into this 1st day of November, 2021, (the "***Effective Date***") and is by and between Crusoe Energy Systems Inc., a Delaware corporation ("***Crusoe***"), and Gondola Resources, LLC, a Delaware limited liability company and Modiin Energy NPB, LLC, a Delaware limited liability company (herein collectively called "***Company***"). Each of Crusoe and Company are referred to herein individually as a "***Party***," or collectively as the "***Parties***."

**Whereas,** Company is a producer of Gas (defined below) and owns and operates oil and gas wells.

**Whereas,** Midstream curtailment and Gas takeaway infrastructure constraints can result in increased Gas flaring, and Company desires to mitigate Gas flaring at the Site (defined below) to potentially reduce its emissions and increase Company's production and oil and gas development.

**Whereas,** Crusoe designs, supplies and operates portable facilities consisting of power generation, computing and remote networking systems capable of consuming Gas (the "***Digital Flare Mitigation System***") on the Site, thereby potentially mitigating Gas flaring and assisting Company with increasing its production.

**Whereas,** the Parties previously entered into (i) that certain Digital Flare Mitigation Gas Purchase Agreement dated June 1, 2021, pertaining to the Company's Gregory Pad, (ii) that certain Digital Flare Mitigation Gas Purchase Agreement dated September 8, 2021, pertaining to the Company's Gregory Pad, and (iii) that certain Digital Flare Mitigation Gas Purchase Agreement dated June 1, 2021, pertaining to the Company's Oxbow Pad (collectively, and as may be amended from time-to-time, the "***Prior Agreements***").

**Whereas,** Company wishes to implement a Digital Flare Mitigation System to find a use for Available Gas (as defined below) produced at the Site that is currently curtailed due to lack of available capacity on midstream takeaway infrastructure.

**Now, Therefore,** in consideration of the promises and mutual covenants set forth herein and good and valuable consideration, the receipt and sufficiency of which are hereby agreed to and acknowledged, the Parties hereby agree as follows:

1. **Gas Purchase Timeline**:

    (a) As soon as reasonably practicable after the Effective Date, but no later than August 31, 2022 (also known as the "***In-Service Date***"), Crusoe will complete installation of five Modules (defined below) at the Site consuming Gas and thereby mitigating natural gas flaring at the Site. Such five Modules shall include three "***Baseload Modules***" and two "***Variable Modules***"; *provided, however,* promptly following the initial production of a well on the Site, if Company reasonably expects the need for additional capacity, it may provide Crusoe with written request, along with reasonable support, for one additional Variable Module, and Crusoe shall install such additional Variable Module at the Site within 60 days of receipt of such written request. For purposes of this

Agreement, "*Site*" means the Surprise Pad located in Jackson County, Colorado, where the Modules will be installed, and/or such other sites set forth in this Agreement or a mutually acceptable well pad(s) or site(s) located in Colorado as designated by Company at any point prior to installation of the Modules, and "*Gas*" means the natural gas as produced in its natural state, including entrained liquids as produced from a well and all other hydrocarbon and non-hydrocarbon components attributable thereto.

(b) The term of this Agreement shall begin on the In-Service Date and continue in full force and effect thereafter for a period of 36 months ("*Initial Term*"). Unless terminated by the Parties in accordance with this Agreement, this Agreement will be extended automatically for successive periods of one year after the expiration of the Initial Term on the same terms and conditions ("*Renewal Term*"). Either Party may terminate this Agreement as to any of the Modules as of the last day of the Initial Term or any appliable Renewal Term upon written notice to the other Party to be received no later than 45 days prior to the expiration of such Initial Term or applicable Renewal Term. The Initial Term and any Renewal Terms shall constitute the "*Term*" for the purposes of this Agreement.

(c) Company shall tender to Crusoe such quantities of Gas as Company shall determine from time to time in its sole discretion ("*Available Gas*") at the inlet flange to Crusoe's generator tie-in manifold on the Digital Flare Mitigation System installed on a Site (each, a "*Delivery Point*"), and Crusoe shall purchase and receive the Available Gas delivered by Company to the Delivery Point up to the Provisional Commitment and use it to operate the Digital Flare Mitigation System at the Site.

(d) During the Renewal Term, if applicable, Company may direct that all of the Modules at the Site be relocated and operated at a new project site within the existing basin of operations, not identified herein, up to one time, by providing 90 days' prior written notice to Crusoe, obtaining Crusoe's prior written consent, which shall not be unreasonably withheld, and by remitting payment of the Relocation Fee described in *Section 8(b)*. The Relocation Fee described in *Section 8(b)* shall be payable by Company for each occurrence of relocation.

(e) In addition to its rights under *Section 1(b)*, Company may terminate this Agreement prior to the end of its Term with 60 days' written notice to Crusoe and payment of the Early Termination Fee described in *Section 8(c)* and Demobilization Fee described in *Section 8(d)*, in each case, if applicable.

2. **Provisional Commitment:** Crusoe acknowledges and understands that Company will on an interruptible basis deliver Available Gas to Crusoe, however Company is not required to deliver any Available Gas if it is prevented from doing so by reasons of Force Majeure ("*Interruptible Basis*"), and Crusoe further acknowledges and understands that the amount of Available Gas delivered will vary from time to time and may depend on factors outside of Company's reasonable control. Company has no obligation to deliver any minimum amount of Gas to Crusoe in any given period; *provided however*, Company shall use commercially reasonable efforts to deliver to Crusoe up to ▇▇▇ Mcf per day ("*Baseload Commitment*") and the nameplate capacities of any installed Variable Modules (collectively, with the Baseload

2

Commitment, the "***Provisional Commitment***") after the Modules have been fully installed at the Site described in *Section 1(a)*, and Crusoe shall receive, purchase, and provide the Modules with capacity to accept in the aggregate up to the Provisional Commitment. The Provisional Commitment with respect to a Module shall not be in effect until all Crusoe equipment is fully installed, and such Module is operationally capable of receiving ratable volumes of Available Gas at the Site up to the Provisional Commitment, which operational capability shall occur, except to the extent relating to the third Variable Module, if applicable, on or before the In-Service Date. Except with respect to an event of Force Majeure, if Company delivers less than 75% of its Baseload Commitment for any 30 total days within any 60-day period (and such failure to deliver is in no way due, in whole or part, to any fault, equipment failure, or inability to or limitation by Crusoe with respect to its obligation to receive, accept, purchase, and use the Gas provided), Crusoe shall have the right, but not obligation, to either (i) remove any of the Modules and reduce (a) the Baseload Commitment (and in effect, the Provisional Commitment) by ▮ Mcf per day for each Baseload Module removed and (b) the Provisional Commitment by the nameplate capacities of any removed Variable Modules, if applicable, or (ii) remove all Modules and terminate this Agreement, in which event Company shall promptly pay the Early Termination Fee, if applicable.  For the purposes of this Agreement "***Module***" shall mean Digital Flare Mitigation System equipment, consisting of two containerized computing units and associated power generation equipment with aggregate Gas consumption of approximately ▮ Mcf/day at ▮ BTU gas. The Modules may only be removed on the terms of this *Section 2* after Crusoe provides Company with 30 days' prior written notice and gives Company an opportunity to cure any deficiencies in the Company's delivery of the Baseload Commitment within said 30-day cure period, in which period Company must restore at least 75% of the Baseload Commitment to the Modules for 90% of the 30-day cure period. Notwithstanding anything to the contrary in this Agreement, Company will be credited for and will be deemed to have met the Baseload Commitment for any day(s) during a Term where Crusoe is limited in its ability to, or unable to, for any reason, receive all or any portion of the Available Gas offered by Company to Crusoe, up to the Baseload Commitment. The Parties shall use meter balancing as the volume reconciliation methodology in the determination that Available Gas was offered but not accepted by Company to Crusoe. This volume reconciliation methodology shall incorporate on-Site measurement device(s) and/or custody transfer meter(s) and shall conform to industry norms and applicable regulatory requirements.

3. **Gas Purchase and Consumption**:

    (a) Gas purchase: Crusoe will pay Company at the rate of ▮ per Mcf for Gas delivered by Company at the Delivery Point for the Modules, remitted in accordance with *Section 9*, which payment will constitute the basis of any tax for purposes of this Agreement.

    (b) Gas consumption: Crusoe will provide and operate equipment capable of uniformly consuming approximately the Provisional Commitment delivered to Crusoe by Company at the Delivery Point to power the Modules. Crusoe will use commercial best efforts to keep the Modules maintained and fully operational, to resolve any maintenance, equipment failures, or operational issues as quickly as possible, and to receive, purchase, and utilize Gas in uniform hourly, daily and monthly flows during a Term.

3

(c) Crusoe agrees that the Gas supplied by Company shall be supplied 'As Is', and that Company does not provide any warranty, quality, or temperature specifications or representations in connection with Gas supplied under this Agreement aside from Company's commitment to supply Gas: (i) at a pressure of ▮▮▮ and (ii) that shall not contain in excess of ▮▮▮ of hydrogen sulfide by volume as determined by a method generally acceptable for use in the industry and to the Parties hereto.

4. **Crusoe Roles and Responsibilities**:

   (a) Provided that Company has complied with its obligations under *Section 5(a)* and *Section 5(d)* and is ready, willing, and able to deliver Available Gas at the applicable Delivery Point, Crusoe will use commercially reasonable efforts to procure, install and operate the Modules and accept all Available Gas tendered by Company, up to the Provisional Commitment at the Site. Specifically, a Module will include:

   (i) Containerized distributed computing modules, which are server and networking systems housed in a custom shipping container.

   (ii) Networking equipment including pole-mounted satellite network receivers.

   (iii) A modular gas-fired generator system that burns approximately ▮ Mcf per day at ▮ BTU gas, and that has related engines and associated permitting that are continuously maintained.

   (b) Crusoe shall obtain and follow all necessary licenses, permits, rules, and regulations applicable to its operations and activities.

   (c) Without amending, modifying, or limiting the Installation Fee described in *Section 8(a)* or Relocation Fee described in *Section 8(b)*, Crusoe will be solely responsible for and shall bear all costs of delivery of the Modules to the Sites. Company may inspect and witness the mobilization of the Modules prior to or upon delivery.

   (d) Crusoe, at its sole cost and expense, shall be responsible for all maintenance and repairs to the Modules and shall repair or replace any Module that breaks down during its respective Term. All fees charged to Company shall be pro-rated, and the Provisional Commitment reduced, for any periods of time in which any Module is unable to accept up to 85% of the Provisional Commitment of Company's Gas delivered to the Delivery Point on the terms of this Agreement, except to the extent such inability is due, in whole or part, to Company or Force Majeure. Crusoe shall substitute comparable equipment during periods of extended repair or maintenance on any Module.

   (e) Crusoe represents and warrants to Company that: (i) Crusoe has obtained all appropriate patents or licenses for possession and use of the Modules; (ii) Crusoe's use and operation of the Modules does not infringe upon the intellectual property rights of any person or entity; (iii) Crusoe is the lawful owner or lessee of the Modules and has the unrestricted right to hold, possess, and use the Modules during the Term; and (iv) the Modules are and shall remain the personal property or leasehold interest of Crusoe;

(v) Crusoe is, and its performance under this Agreement shall be, in compliance with all laws, ordinance, orders, regulations, or requirements applicable to Crusoe's ownership and operation of the Modules on the terms of this Agreement; and (vi) each Module shall be capable of accepting up to ▮ Mcf of Gas per day at ▮ BTU.

(f) Crusoe shall ensure that the exterior of any Modules will be painted "Shale Green" as depicted on the Bureau of Land Management Chart of Standard Environmental Colors.

(g) At all times during which Crusoe and the Modules are at the Site, including, without limitation, during any installation, operation, maintenance, relocation, or removal of the Modules, Crusoe covenants and agrees to use commercially reasonable efforts to conform its operations, including, without limitation, Crusoe's ingress to and egress from the Site, to the requirements of the following surface use agreements (the "***Surface Use Agreements***") in all material respects insofar as the same relate to Crusoe's operations:

That certain Agreement for Office-Warehouse-Storage Facility Site, Easement, Surface Use & Access dated effective December 1, 2015 by and between Jack E. Haworth and Veneta C. Haworth as Surface Owners and EE3, LLC as Operator, as amended by that certain Amendment to Agreement for Office-Warehouse-Storage Facility Site, Easement, Surface Use & Access dated effective December 1, 2017 by and between Jack E. Haworth and Veneta C. Haworth as Surface Owners and SandRidge Exploration and Production, LLC as Operator, as amended by that certain 2nd Amendment to Agreement for Office-Warehouse-Storage Facility Site, Easement, Surface Use & Access dated effective May 1, 2019 by and between Jack E. Haworth and Veneta C. Haworth as Surface Owners and SandRidge Exploration and Production, LLC as Operator. (h) Crusoe, at its sole cost and expense, may bring utility power to a designated area on the Site pending express approval of line route across the Site by Company, and by obtaining all necessary permits and approvals, where any utility power utilized by Crusoe, fees attributable thereto, and reclamation costs will be borne solely by Crusoe under a separate power purchase agreement between Crusoe and the utility provider  At the request of the Company, Crusoe will remove any electrical infrastructure and remediate the line route and infrastructure across the Site upon termination of the Agreement.

Notwithstanding the foregoing language in this *Section 4(g)*, Crusoe will not be liable for any actions by any member of Company Group that cause a breach of the Surface Use Agreements and Crusoe will conform its operations to the conditions and obligations of the Surface Use Agreements specific to or which may apply to Crusoe's operations. Company will ensure that Crusoe has the right and allowances to operate Digital Flare Mitigation System on the site.

5. **Company Roles and Responsibilities**: Company will use commercially reasonable efforts to provide the Provisional Commitment of Available Gas on an Interruptible Basis and further use commercially reasonable efforts to provide the following:

(a) Access to a designated 60' x 75' area (approximately) per Module at the Site with ingress and egress thereto. Site selection shall be at Company's discretion.

(b) Access to Company operational personnel to discuss matters related to installation and operation of the Modules.

(c) Provide project-related information such as Gas analysis, Gas flow rate and pressure data and relevant operational plans.

(d) Deliver Gas at the Delivery Point at a pressure of ▬▬▬▬▬▬▬▬▬▬▬▬▬▬ ▬.

(e) Company shall bury or lay, insulate and heat trace Gas supply lines and condensate and other liquid return lines to and from Company's facilities to the Delivery Point, inclusive of any metering facilities. Gas supply and liquid return lines shall be provisioned with appropriate winterization features such as methanol injection ports and knock outs.

(f) Company shall ensure that only single-phase gas is provided to Crusoe by installing a separator with liquid level control at the Delivery Point or downstream of all underground piping, whichever is closer to Crusoe's equipment.

(g) Additionally and prior to the applicable In-Service Date, upon Crusoe's written request and the completion of Company's Gas supply lines to the applicable Delivery Point, Company shall sell and deliver to Crusoe and Crusoe shall purchase and receive from Company up to ▬▬ Mcf of Gas per day at a rate of ▬▬▬ per Mcf for Gas delivered by Company at the Delivery Point ("***Pre-Commissioning Testing Gas***") used solely for the purpose of testing and commissioning the Modules at the Site. Company shall invoice and separately bill Crusoe for the Pre-Commissioning Testing Gas within 30 days from the applicable In-Service Date and Crusoe shall pay to Company by wire-transfer within 30 days from receipt of Company's invoice therefor.

6. **Events of Default:** If either Party (the "***Defaulting Party***") fails to perform any of the terms of this Agreement, excluding Force Majeure events (defined below), the other Party (the "***Non-Defaulting Party***") may treat such default as a material breach of the entire Agreement, except to the extent caused by the Non-Defaulting Party; and, if such default is not cured within 90 days, except for payment defaults, which if not cured within thirty (30) days, of receipt of written notice by the Defaulting Party ("***Default Cure Period***"), then the Non-Defaulting Party may immediately terminate this Agreement. In any event, termination of this Agreement by either Party shall not remove Crusoe's obligation to pay in full for Gas received prior to termination. The Parties acknowledge that each of the following, among other things, constitutes an "***Event of Default***":

   (a) **Failure to Pay:** Failure by either Party to make payment in full by the due date for any undisputed amounts owed under this Agreement; provided that such Party has received written notice of such failure and has had 30 days to cure such failure.

(b) **Failure to Take Delivery:** Failure by Crusoe to take delivery of up to 85% of the Baseload Commitment of Available Gas under the provisions of this Agreement, including but not limited to any inability to maintain or operate the Modules and Crusoe's other equipment for any reason.

(c) **Material Misrepresentation:** Either Party has made a representation or warranty under this Agreement that proves to be untrue in any material respect.

(d) **Performance:** Failure by either Party to timely perform any other material obligation under this Agreement.

For the purpose of clarity, no failure on the part of Company to deliver any Provisional Commitment, and no removal by Crusoe of any of the Modules on the terms of *Section 2*, shall constitute an Event of Default.

**Company Remedies:** In addition to Company's rights and remedies under this Agreement, if an Event of Default by Crusoe occurs, at Company's option and, after the expiration of the Default Cure Period, without further demand, notice or legal process, Company may exercise any and all of its rights and remedies under this Agreement and/or under applicable law, including without limitation, (i) suspending performance under this Agreement; (ii) accelerating payment obligations such that all amounts owed under this Agreement shall become immediately due and payable; and (iii) terminating this Agreement with immediate effect; provided, however, no Demobilization Fee or Early Termination Fee shall be payable if Company terminates this Agreement on the terms of this paragraph.

7. **Title and Ownership**:

    (a) Upstream of a Delivery Point, Company shall have title, custody, control, and risk of loss of the Gas. Title to the Gas supplied by Company shall transfer to Crusoe upon delivery to a Delivery Point. Crusoe shall have custody, control, and risk of loss of the Gas supplied by Company from the moment in time when such Gas is supplied by Company at a Delivery Point.

    (b) At all times before, during, and after each Term of this Agreement, Crusoe shall have possession, custody and control of the Modules and all of Crusoe's equipment at the applicable Site.

8. **Fees**:

    (a) **Installation Fee:** Company shall pay Crusoe an installation fee of ▮▮▮ or the Module (the "***Installation Fee***"). Any Installation Fee shall be paid by Company within 30 days of its receipt of Crusoe's invoice for the same.

    (b) **Relocation Fee:** Company may cause Crusoe to relocate any Module at any time during the Renewal Term, if applicable. Company shall pay Crusoe a "***Relocation Fee***" equal to ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ provided, however, the Relocation

7

Fee per Module is not to exceed ▮. Any Relocation Fee shall be paid by Company within 30 days of receipt of Crusoe's invoice for the same.

(c) **Early Termination Fee:** If Company chooses to terminate this Agreement after execution but before the end of the Initial Term, Company will provide 60 days' advance written notice to Crusoe and Company shall pay Crusoe an "*Early Termination Fee*" equal to ▮▮▮. No Early Termination Fee shall be payable if its Term is outside of the Initial Term. Any Early Termination Fee shall be paid by Company within 30 days of receipt of Crusoe's invoice for the same.

(d) **Demobilization Fee**: Company shall pay Crusoe ▮ for the cost to demobilize an active Module if this Agreement is terminated before the 18-month anniversary of the In-Service Date, except when early termination is the result of an Event of Default by Crusoe as specified in *Section 6* (a "*Demobilization Fee*"). If this Agreement is terminated more than eighteen (18) months after the In-Service Date the Demobilization Fee shall be reduced to ▮ per Baseload Module and ▮ per Variable Module, and the Demobilization Fee shall be eliminated on and after the 36-month anniversary of the In-Service Date of the Module. If Company terminates this Agreement due to an Event of Default by Crusoe, the Demobilization Fee shall be waived and Company shall pay Crusoe ▮ for demobilization costs. Any Demobilization Fee shall be paid by Company within 30 days of receipt of Crusoe's invoice for the same.

(e) **Service Fee**. Company shall pay Crusoe a monthly service fee in the amount of ▮ (the "*Service Fee*").

(f) **Standby Fee**: The Parties acknowledge that the Variable Modules will be installed because the Available Gas delivered to the Delivery Point is anticipated to decline after initial production of the associated wells. If Crusoe reasonably determines that a Variable Module is no longer required at the Site, Crusoe may deliver written notice to Company of such status (a "*Standby Notice*"), and the Provisional Commitment will immediately decrease by the nameplate capacity of such Variable Module. Company may respond within five days of receipt of such Standby Notice and elect to pay a "*Standby Fee*" equal to ▮ per Module per month (prorated for any partial months) until the earlier of (i) the date there is sufficient Available Gas delivered to the Delivery Point to support operating such Variable Module, (ii) the date that Company elects to terminate a Variable Module with a Standby Fee already in place, or (iii) after 18 months following the In-Service Date, the date that Crusoe elects to terminate a Variable Module with a Standby Fee already in place. If Company fails to elect to pay the Standby Fee, elects not to pay the Standby Fee, or elects to terminate a Variable Module with a Standby Fee already in place, Crusoe has the right, but not the obligation, to remove the applicable Variable Module(s) with at least three days' written notice, and Company shall pay the applicable Demobilization Fees and Early Termination Fees. Notwithstanding the remainder of this *Section 8(f)* and regardless of Company's election to pay a Standby Fee, after 18 months following the In-Service Date, Crusoe has the right, but not the obligation, to remove Variable Module(s) for

    which it has provided a Standby Notice with at least three days' written notice, and Company shall pay the applicable Demobilization Fees and Early Termination Fees. Any Standby Fee shall be paid by Company within 30 days of receipt of Crusoe's invoice for the same.

    (g) Other than fees outlined above in *Section 8(a)-(f)*, each Party shall bear its own costs related to the fulfilment of roles and responsibilities outlined in this Agreement, and neither Party shall be liable to the other for any form of cost recovery; provided, however, that nothing in this *Section 8(g)* shall amend, modify, or limit any right of a Party to pursue remedies for material breaches of this Agreement or any of the obligations and rights to indemnification for third party claims pursuant to *Section 15*; provided further, however, that Company will be responsible for all payments owed under the Surface Use Agreements.

9. **Billing and Payment**:

    (a) Company shall render to Crusoe on or before the 15th day of the month following the month of delivery a statement showing the volume of Gas purchased by Crusoe from Company during the prior month. Crusoe shall make payment to Company by wire transfer on or before the 25th day of the month following the month of delivery. Either Party may set off and reduce any amounts that such Party owes the other Party by any amounts owed to such Party under this Agreement, and, in such event, the offsetting Party shall furnish the other Party a written statement detailing any such setoffs.

    (b) Should either Party fail to render payment as set forth in *Section 8* or *Section 9(a)*, such Party shall pay the other Party interest on any overdue, undisputed amount at a rate equal to the higher of: (i) the then effective U.S. prime rate of interest published under the table entitled "Money Rates" by The Wall Street Journal, plus two percent per annum, or (ii) the maximum applicable interest rate allowed by law from due date until such overdue, undisputed amount and interest thereon are paid; provided, however, that no interest shall be due on any amount that is the subject of a good-faith dispute.

    (c) No adjustment or correction shall be required of any error or inaccuracy occurring in any statement, payment, account, calculation or determination following two years from the making or the rendering of same. Failure of the Parties to make a claim for adjustment within such period shall preclude the filing of exceptions or making claims for adjustment. Each Party expressly agrees that in the event a good-faith disagreement arises as to any amount due hereunder, all non-disputed amounts will be paid in accordance with this *Section 9* and the disputing Party shall provide supporting documentation acceptable in industry practice to support the amount disputed. In the event the Parties are unable to resolve such good-faith dispute, either Party may pursue any remedy available at law or in equity to enforce its rights pursuant to this *Section 9*.

    (d) Either Party shall have the right, at its own expense, upon reasonable notice in writing to the other Party and at reasonable times, to examine, audit or inspect the measurement activities or request a copy of the relevant portion of the books and records of the other Party only to the extent reasonably necessary to verify the accuracy of any statement,

charge, payment or computation made relating to this Agreement, and such Party will provide same to the requesting Party within seven days of such request. The scope of any audit under this *Section 9* shall be limited to transactions affecting fees in *Section 8* and Available Gas bought and sold hereunder and shall survive for a period of 24 months following the year in which the termination of this Agreement occurs.

10. **Access:** Company acknowledges that Crusoe's lenders (including, for the avoidance of doubt, ███████████████████████████████████████ and their affiliates), whether one or more, that have liens on or security interests in Crusoe's equipment located at the Site, is authorized hereby, subject to customary work site health and safety protocols of general applicability, to access and enter the Site in connection with any such lender's exercise of rights and remedies as a secured creditor with respect the Digital Flare Mitigation System, and such lender may enforce the foregoing entry and access rights as a third party intended beneficiary hereof, without the need for consent or joinder of Crusoe to any action, suit or proceeding to enforce the foregoing rights. Company agrees that third party lessors, lenders and security holders of portions of the Digital Flare Mitigation System may enter the Site at any time or times with advance notice given to Company, during normal business hours, to inspect or remove any portion of the Digital Flare Mitigation System therefrom, without charge. Company shall not hinder any such third party's actions in enforcing its liens and remedies with respect to the Digital Flare Mitigation System.

11. **Taxes**: Company shall pay or cause to be paid all taxes, fees, levies, severance payments, penalties, licenses or charges imposed by any government authority ("*Taxes*") on or with respect to the Available Gas and Company's handling thereof prior to the Delivery Point(s). Crusoe shall pay or cause to be paid all Taxes on or with respect to Available Gas and Crusoe's handling thereof at the Delivery Point(s) and all Taxes after the Delivery Point(s). If a Party is required to remit or pay Taxes that are the other Party's responsibility hereunder, the Party responsible for such Taxes shall promptly reimburse the other Party for such Taxes. Any Party entitled to an exemption from any such Taxes or charges shall furnish the other Party any necessary documentation thereof. Crusoe shall bear all taxes levied against its properties or facility(ies). Subject to any change in the law with respect to Taxes under this Agreement, the Parties agree to mutually discuss and cooperate in the optimization or reduction (if legally applicable and in a written opinion of each Party's Tax Counsel) of any of the above mentioned Taxes. Crusoe shall not claim any exemptions for any Well related to flaring of gas for severance tax purposes without first securing the written consent of Company, which consent may be withheld in the Company's sole discretion.

12. EACH PARTY AGREES TO INDEMNIFY, RELEASE AND HOLD THE OTHER PARTY HARMLESS FROM AND AGAINST ANY AND ALL CLAIMS, DEMANDS, LOSSES, LIABILITY, COSTS, EXPENSES (INCLUDING REASONABLE ATTORNEYS' FEES), PENALTIES AND INTEREST ASSESSED AGAINST SUCH PARTY DUE TO THE DISALLOWANCE FOR ANY REASON OF ANY TAX EXEMPTION CLAIMED BY THE INDEMNIFYING PARTY.

13. **Public Relations and Regulatory Support**: To the extent that it may be helpful to highlight Company's commitment to Gas offtake solutions, Crusoe will assist, only upon Company's written request, with presentations to local, state or federal regulators. Such presentations may

outline the potential benefits of the Modules as they pertain to the environment, communities, resource stewardship and the broader energy industry. Depending on the level of technical detail requested for such presentations, Crusoe may request to provide this information on a confidential basis in order to protect proprietary information, designs, and other commercially sensitive details. **CRUSOE REPRESENTS, WARRANTS AND COVENANTS THAT IT SHALL NOT MAKE ANY PRESS RELEASE OR OTHER ANNOUNCEMENT CONCERNING THIS AGREEMENT OR THE EXISTENCE THEREOF WITHOUT COMPANY'S PRIOR WRITTEN CONSENT.**

14. Non-Disclosure:

   (a) Confidentiality. "***Confidential Information***" under this Agreement means all technical and business information that is (i) made available to one or more members of a Party's Group (the "***Non-Disclosing Party's Group***"), directly or indirectly, by the other Party, or developed or acquired by a member of either Party's Group in performance of this Agreement. The Non-Disclosing Party's Group will hold in confidence all Confidential Information. The Non-Disclosing Party's Group may not use Confidential Information for any purpose other than the performance of the Agreement. Crusoe Group may not take any photographs, videos, or other recordings of Company Group's property without Company's prior written consent. Neither Party is permitted to use or make mention in any way of the other Party's or its Affiliates' names or mention the existence of this Agreement or the activities contemplated hereunder, without advance written approval from the other Party. Except with respect to auditing purposes under *Section 9(d)* above, notwithstanding anything in this Agreement to the contrary, the obligations of each Party set forth in this *Section 14(a)* shall survive for two years following termination or expiration of this Agreement. The term Confidential Information shall not include information that:

   (i) is already known to the Non-Disclosing Party's Group prior to the date of disclosure by the disclosing Party hereunder, provided that the source of such information had the right to disseminate such information at the time it is acquired by the Non-Disclosing Party's Group;

   (ii) is already available or becomes generally available to the public other than through the act or omission of the Non-Disclosing Party's Group;

   (iii) is acquired independently by the Non-Disclosing Party's Group on a non-confidential basis from a third party that represents that it has the right to disseminate such information at the time it is acquired by the Non-Disclosing Party's Group; or

   (iv) is developed by the Non-Disclosing Party's Group independently and without reliance or use of any Confidential Information.

   (b) Use of Name and Marks. The Parties represent, warrant and covenant, that neither Party shall, in any format, without the prior written consent of the other Party, use such other Party's or any of its Affiliate's (expressly including any entity owned or controlled by

      a Party) names, trade names, or trademarks in any advertising or communication to the public, or make publicity releases or announcements concerning this Agreement or related activities.

    (c) <u>Intellectual Property.</u> Company agrees and acknowledges that Crusoe's Modules and all information related thereto, together with any and all modifications thereto made during any Term, is proprietary in nature, and shall remain the sole property of Crusoe. Company's rights, as they pertain to the Available Gas, including, without limitation, cryptocurrency, data processing, or computing, shall terminate upon delivery to Crusoe at a Delivery Point.

**15. Indemnification**:

    (a) <u>Definitions</u>. The following definitions shall be applied throughout this Agreement:

        (i) "***Affiliate***" shall mean, with respect to a Party, any individual, partnership, joint venture, firm, corporation, association, trust or other entity directly or indirectly controlling, controlled by, or under common control with, such Party.

        (ii) "***Company Group***" shall mean individually or in any combination, Company, its Affiliates, co-owners or co-lessees (whether of a fee, lease, mineral lease or otherwise) at a Site, joint interest owners, joint venturers, partners, contractors and subcontractors of any tier (other than Crusoe or its subcontractors) and all of their respective officers, directors, managers, members, agents, representatives, employees, and insurers.

        (iii) "***Consequential Damages***" shall mean any special, indirect, incidental, or consequential damages, costs, or expenses of any kind or character (including but not limited to loss of use, lost income, lost or delayed profits or revenue, loss of business or goodwill, unabsorbed overhead and increased expenses).

        (iv) "***Crusoe Group***" shall mean individually or in any combination Crusoe, its Affiliates, any third party lessors and security holders of portions of the Digital Flare Mitigation System, any contractor and subcontractor of Crusoe of any tier, and their respective officers, directors, managers, members, agents, representatives, employees, and insurers.

        (v) "***Group***" means either the Crusoe Group or the Company Group, as applicable.

    (b) <u>Crusoe's Obligations</u>. Crusoe hereby releases and shall defend, indemnify and hold the Company Group harmless from and against any and all claims, awards, damages, demands, judgements, settlements, and causes of action of every kind and character (including without limitation, fines, penalties, remedial obligations, court costs and reasonable attorneys' fees, including attorneys' fees incurred in the enforcement of this indemnity) (collectively the "***Indemnifiable Claims***") arising out of, without limitation, any physical or mental injury, illness and/or death, or any damage to or loss of property, of any one or more members of the Crusoe Group in any manner incident to, connected with or arising out of the performance of this Agreement and/or the

Module. This obligation is without regard to the cause or causes thereof, including, without limitation, the negligence (whether sole, joint, contributory, or concurrent) of one or more members of Company Group. Crusoe agrees that its indemnity obligations herein will be supported by insurance with at least the minimum amounts provided in *Section 16*, which insurance will be primary to any other insurance provided by or available to any one or more members of the Company Group and shall to the extent of the liabilities assumed in this agreement provide waivers of subrogation against all members of Company Group. To the extent that applicable law prohibits the monetary limits of insurance required or the indemnities voluntarily assumed hereunder, the requirements will be automatically revised to conform, to the maximum extent permitted, with applicable law.

(c) Company's Obligations. Company hereby releases and shall defend, indemnify and hold the Crusoe Group harmless from and against any and all Indemnifiable Claims arising out of, without limitation, any physical or mental injury, illness and/or death, or any damage to or loss of property, of any one or more members of the Company Group in any manner incident to, connected with or arising out of the performance of this Agreement. This obligation is without regard to the cause or causes thereof, including, without limitation, the negligence (whether sole, joint, contributory, or concurrent) of one or more members of Crusoe Group. Company agrees that its indemnity obligations herein will be supported by insurance, which insurance will be primary to any other insurance provided by or available to any one or more members of the Crusoe Group and shall to the extent of the liabilities assumed in this agreement provide waivers of subrogation against all members of Company Group. To the extent that applicable law prohibits the monetary limits of insurance required or the indemnities voluntarily assumed hereunder, the requirements will be automatically revised to conform, to the maximum extent permitted, with applicable law.

(d) Royalties. Company has the sole and exclusive obligation and liability to account for and remit all royalties, overrides, and other sums due the owners of the minerals, royalties or other interests in and any other person due any proceeds derived from the Gas delivered hereunder. Notwithstanding any other provision to the contrary, Company shall indemnify, defend and hold Crusoe Group harmless from and against any and all Indemnifiable Claims related to the payment of royalties, overrides, and other sums due the owners of the minerals, royalties or other interests in, and any other person due any proceeds derived from, the Gas delivered hereunder.

(e) Consequential Damages.  Except for breach of any provision of *Section 14* (Non-Disclosure), in no event will either Party be liable to the other under this Agreement for Consequential Damages.

(f) Intellectual Property.  Crusoe indemnifies Company Group against any Indemnifiable Claims of alleged or actual infringement or contributory infringement of any patent, copyright or trademark, or for misappropriation of any trade secret relating to the Module. Neither Party shall settle or compromise any Indemnifiable Claim regarding such infringement made by a third party without the written consent of the other Party. In the event of any such Indemnifiable Claim, Crusoe shall undertake whatever actions

are necessary to place Company in the position that it would have been had there been no infringement or misappropriation.

(g) <u>Unallocated Claims</u>. Any Indemnifiable Claim not otherwise allocated under this Agreement shall, as between the Parties, be borne by each Party in proportion to its breach of contract, negligence, and/or fault (if any).

(h) <u>Express Negligence</u>. EXCEPT AS OTHERWISE EXPRESSLY LIMITED HEREIN, IT IS THE INTENT OF PARTIES HERETO THAT ALL INDEMNITY OBLIGATIONS AND/OR INDEMNIFIABLE CLAIMS ASSUMED BY SUCH PARTIES UNDER TERMS OF THIS AGREEMENT BE WITHOUT LIMIT AND WITHOUT REGARD TO THE CAUSE OR CAUSES THEREOF, INCLUDING PREEXISTING CONDITIONS, STRICT LIABILITY, FAULT, BREACH OF CONTRACT OR WARRANTY, OR THE NEGLIGENCE OF ANY PARTY OR PARTIES, WHETHER SUCH NEGLIGENCE BE SOLE, JOINT, CONTRIBUTORY, OR CONCURRENT, ACTIVE, PASSIVE, OR ORDINARY OF THE INDEMNITEES. THE PARTIES AGREE THAT THEIR INDEMNITY OBLIGATIONS WILL BE SUPPORTED BY LIABILITY INSURANCE OBTAINED FOR THE BENEFIT OF THE OTHER PARTY (AND ITS RESPECTIVE GROUP MEMBERS) AS INDEMNITEES WITH MINIMUM LIMITS AND COVERAGES NOT LESS THAN THOSE REQUIRED TO BE MAINTAINED UNDER *SECTION 16*. THE PARTIES ALSO AGREE THAT THEIR INDEMNITY OBLIGATIONS ARE NOT INTENDED TO BE LIMITED BY ANY INSURANCE REQUIREMENTS EXCEPT TO THE EXTENT MANDATED BY APPLICABLE LAW AND THAT THE INSURANCE REQUIREMENTS AND THE INDEMNITY PROVISIONS SHALL BE SEPARATE AND DISTINCT OBLIGATIONS AND SHALL BE SEPARATELY AND INDEPENDENTLY ENFORCEABLE. IN NO EVENT SHALL A PARTY BE ENTITLED TO INDEMNIFICATION FOR ANY LOSS ARISING FROM THE GROSS NEGLIGENCE OR WILLFUL MISCONDUCT OF A MEMBER OF ITS GROUP.

**16. Insurance**:

(a) <u>Coverages</u>. Subject to the provisions of this *Section 16*, each Party will secure and maintain, and will require its subcontractors to secure and maintain, during each Term of this Agreement the following policies with limits not less than the amounts specified, and with companies reasonably satisfactory to the other Party who are authorized to do business in each jurisdiction where the Modules are operating:

(i) Worker's Compensation Insurance with limits of not less than $1,000,000 or the statutory requirements of State laws (as well as Federal laws, if applicable), whichever is greater, which shall include Employer's Liability Insurance with limits of not less than $500,000 per incident. If the work is to be performed in the states of North Dakota, Ohio, Washington or Wyoming, "Stop-Gap" Employer's Liability Insurance with limits of not less than $500,000 per incident must be procured.

    (ii) Commercial General Liability Insurance INCLUDING CONTRACTUAL LIABILITY, with minimum limits of liability for injury, death, or property damage of $1,000,000 combined single limit per occurrence, and an aggregate annual limit of not less than $2,000,000.

    (iii) Automobile Liability Insurance covering owned, hired, and non-owned vehicles used by such Party, with minimum limits of liability for injury, death, or property damage of $1,000,000 combined single limit per occurrence.

    (iv) Umbrella Insurance (with coverage at least as broad as the underlying policy) over that required in *Section 16(a)(ii)* and *Section 16(a)(iii)* with minimum limits of $5,000,000, and specifically including contractual liability.

(b) <u>Primary Coverage and Additional Insureds</u>. ALL INSURANCE POLICIES AND COVERAGES LISTED IN THIS SECTION 16 WILL EXTEND TO AND PROTECT EACH PARTY'S GROUP TO THE FULL EXTENT AND AMOUNT OF SUCH COVERAGE, INCLUDING EXCESS OR UMBRELLA INSURANCES. ALL INSURANCE POLICIES LISTED IN THIS SECTION 16 WILL BE PRIMARY TO, AND RECEIVE NO CONTRIBUTION FROM, ANY OTHER INSURANCE PROGRAMS MAINTAINED BY OR ON BEHALF OF OR BENEFITING THE COMPANY GROUP OR CRUSOE GROUP, AS APPLICABLE. THE LIMITS AND COVERAGES OF THE INSURANCES OBTAINED BY A PARTY WILL IN NO WAY LIMIT THE LIABILITIES OR OBLIGATIONS ASSUMED BY SUCH PARTY UNDER THIS AGREEMENT. ALL OF A PARTY'S LIABILITY INSURANCE POLICIES, EXCEPT WORKERS COMPENSATION, EMPLOYER'S LIABILITY AND PROFESSIONAL LIABILITY WILL TO THE EXTENT OF THE LIABILITIES ASSUMED IN THIS AGREEMENT NAME THE OTHER PARTY'S GROUP AS ADDITIONAL INSUREDS. ALL OF A PARTY'S INSURANCE POLICIES WILL TO THE EXTENT OF THE LIABILITIES ASSUMED IN THIS AGREEMENT CONTAIN A WAIVER ON THE PART OF THE INSURER, BY SUBROGATION OR OTHERWISE, OF ALL RIGHTS AGAINST THE OTHER PARTY'S GROUP.

(c) <u>Certificate of Insurance</u>. Each Party or such Party's insurance carrier(s) will upon request furnish certificates of insurance reasonably satisfactory to the other Party, reflecting the insurance requirements of this *Section 16*, as evidence that the required insurance coverage has been obtained and maintained, before commencing the installation of any Module.

(e) <u>Self-Insured.</u> Notwithstanding the above, the Parties agree for purposes of this *Section 16*, that Company may elect to self-insure all or any part of its insurance requirements to the extent allowed by applicable law.  Upon written request, Company will provide Crusoe with a letter of self-insurance evidencing its compliance with this clause.

(d) <u>Waiver</u>. No waiver of the provisions of this *Section 16* will be inferred from any failure on the part of a Party to object or complain about any failure of the other Party or such other Party's insurance carrier to provide such certificate of insurance. Each Party shall

provide the other Party notice and evidence of any modification to, or extension or cancellation of, such Party's required insurance coverage.

**17. Miscellaneous**:

(a) <u>Relationship of Parties</u>. Neither Party shall: (a) act or represent or hold itself out as having authority to act as an agent or partner of the other Party; or (b) in any way bind or commit the other Party to any obligations or agreement. Nothing contained in this Agreement shall be construed as creating a partnership, joint venture, agency, trust, fiduciary relationship or other association of any kind, each Party being individually responsible only for its obligations as set forth in this Agreement. The Parties' respective rights and obligations hereunder shall be limited to the contractual rights and obligations expressly set forth herein on the terms and conditions set forth herein.

(b) <u>Notices</u>. All notices or other communications required or permitted hereunder shall be in writing and shall be deemed given or delivered when delivered personally, by electronic mail or when sent by registered or certified mail (postage prepaid, return receipt requested) or by an internationally recognized overnight courier service addressed as follows:

**Crusoe Energy Systems Inc.**
Attn: Cully Cavness
1660 17th St. Suite 350
Denver, CO 80202
Telephone: 720-837-5099
***Email: cully@crusoeenergy.com***

**Gondola Resources, LLC**
Attn: Brad Morse, Daniel Silverman, and Ryan Sullivan
410 17th Street, Suite 1110
Denver, Colorado 80202
Telephone: 720-328-5070
*Email:* ryan@fulcrumef.com

**Modiin Energy NPB, LLC**
Attn: Yaniv Friedman
3 Azrieli Center, Triangle Tower
42nd Floor
Tel Aviv, Israel 67023
Telephone: 972-73-2683614
Yaniv.friedman@modiin-energy.com

Any Party may change its address for notices hereunder by written notice delivered in accordance herewith.

(c) <u>Successors and Assigns</u>. The rights and obligations of either Party under this Agreement are not assignable by such Party without the prior written consent of the other Party; provided, however, that either Party may, without the other's consent, assign its rights and obligations hereunder (a) to any of its Affiliates; and (b) in connection with a change of control or sale of all or substantially all of the assets of such Party or its Affiliates relating to this Agreement. This Agreement shall be binding upon and inure to the benefit of the Parties and their successors and permitted assigns.

(d) <u>Force Majeure</u>. Each Party will be excused from complying with the terms and conditions of this Agreement if, to the extent, and for as long as, such Party's compliance is delayed or prevented by a Force Majeure event. A Force Majeure event will not excuse (i) making payments; (ii) performing indemnity obligations; or (iii) other duties not directly limited by a Force Majeure event. If a Party is rendered unable, wholly or in part, by a Force Majeure event to perform, that Party will give written notice detailing such Force Majeure event to the other Party as soon as possible. If a Force Majeure event continues for more than 120 days in any consecutive 180-day period, any Party may cancel this Agreement by giving written cancellation notice to the other Party. Failure to perform due to events of Force Majeure shall not extend any Term. As used herein, "***Force Majeure***", means an occurrence that is (i) beyond the reasonable control and without the fault or negligence of the Party affected, and (ii) that the affected Party is unable to prevent or provide against by the exercise of reasonable diligence, including, but not limited to the following occurrences to the extent such occurrences meet the requirements of subparts (i) and (ii) of this definition: (a) nationwide or regional strikes or any other nationwide or regional concerted acts of workers; (b) acts of the public enemy, wars, blockades, insurrections, riots, civil disturbances, epidemics, terrorism or sabotage; (c) acts of God; (d) floods or unusually severe weather; (e) accidents to equipment, machinery, plants, facilities, or lines of pipe; (f) fires, explosions, or other catastrophes; (g) restraints of or other interference or restrictions imposed by a governmental authority, necessity for compliance with any applicable law or confiscation; and (h) material upstream oil and gas regulations, fracking or flaring bans, or restrictions on oil or gas production on federal or state lands. Notwithstanding anything to the contrary set forth in this Agreement, none of the following shall, under any circumstance, constitute a Force Majeure event: (1) the lack of financial resources, or the inability of a Party to secure funds or make payments as required by this Agreement absent the other Party's material breach of this Agreement which has a material adverse effect on such Party; (2) on its own, adverse market, financial or other economic conditions including changes in market conditions that either directly or indirectly affect this Agreement or the demand for or price of Gas, NGL plant products, or condensate; (3) availability of more attractive markets or gathering, transportation or processing services for Gas, NGL plant products, or condensate; (4) failure to meet minimum flow requirements on any equipment; or (5) late performance or late delivery of equipment or materials by any Party or any of its contractors or subcontractors, unless the event was caused by a Force Majeure of the type set forth above and was beyond the reasonable control and without the fault of the claiming Party or its contractors or subcontractors, and a commercially acceptable alternate source of services, equipment or materials is unavailable.

(e) <u>Business Standards</u>. Crusoe will conduct its activities in an ethical manner and will not engage in any activity that could create a conflict of interest, such as making, receiving, or offering substantial gifts, entertainment, payments, loans or anything else of value to personnel or representatives of Company or their families for the purpose of influencing those persons to act contrary to Company's best interests. This obligation shall apply to the activities of the Crusoe Group in their relations with the employees of Company and their families and third parties arising from this Agreement.

(f) <u>Warranties</u>. Each Party warrants to the other that it is legally capable of entering into this Agreement and that there are no other existing agreements or instruments that would impair such Party's ability to perform it obligations hereunder. Company further warrants that it has the right to sell and will transfer good and merchantable title to Available Gas delivered and sold hereunder and that such Available Gas is free from all royalties, liens, encumbrances and/or adverse claims of every nature and kind which would prohibit Company's transfer of clear title to Crusoe.

(g) <u>Disclaimers</u>. Except as set forth in this Agreement, Crusoe disclaims all other warranties or other guarantees of any kind, express, implied or statutory, with respect to Crusoe's Module.

(h) <u>Emission Reductions</u>. Company remises, releases, and quitclaims any rights to emission reduction credits generated by deployment of Crusoe's Module.

(i) <u>Entire Agreement; Amendments</u>. This Agreement contains the entire understanding of the Parties with regard to the subject matter contained herein or therein, and supersedes all other prior representations, warranties, agreements, understandings. This Agreement may not be amended, modified or supplemented except by a written instrument signed by an authorized representative of each of the Parties.

(j) <u>Waivers</u>. Any term or provision of this Agreement may be waived, or the time for its performance may be extended, by the Party entitled to the benefit thereof. Any such waiver shall be validly and sufficiently authorized for the purposes of this Agreement if, as to either Party, it is authorized in writing by an authorized representative of such Party. The failure of either Party hereto to enforce at any time any provision of this Agreement shall not be construed to be a waiver of such provision, nor in any way to affect the validity of this Agreement or any part hereof or the right of such Party thereafter to enforce each and every such provision. No waiver of any breach of this Agreement shall be held to constitute a waiver of any other or subsequent breach.

(k) <u>Survival</u>. Notwithstanding the suspension or termination of this Agreement or any Force Majeure event, the Parties shall continue to be bound by the provisions of this Agreement that reasonably require some action or forbearance after such termination, including but not limited to those related to warranties, indemnities, and insurance.

(l) <u>Execution in Counterparts</u>. This Agreement may be executed and delivered in two or more counterparts, each of which when executed and delivered shall be an original, and all of which when executed shall constitute one and the same instrument. The exchange of copies of this Agreement and of signature pages by facsimile or other electronic transmission shall constitute effective execution and delivery of this Agreement as to the Parties and may be used in lieu of the original Agreement for all purposes. Signatures of the Parties transmitted by email or other electronic means shall be deemed to be their original signatures for all purposes.

(m) <u>Governing Law; Submission to Jurisdiction</u>. All issues and questions concerning the construction, validity, interpretation and enforceability of this Agreement shall be

governed by, and construed in accordance with, the laws of the state of Colorado, without giving effect to any choice of law or conflict of law rules or provisions that would cause the application of the laws of any jurisdiction other than that state. Any action or proceeding seeking to enforce any provision of, or based on any right arising out of, this Agreement or the transactions contemplated hereby may be brought against either of the Parties solely in the federal or state courts located in Denver, Colorado, and each of the Parties consents to the exclusive jurisdiction of such courts (and of the appropriate appellate courts) in any such action or proceeding and expressly and irrevocably waives, to the fullest extent permitted by applicable law, any objection to venue laid therein; agrees and consents to service of process by certified mail, delivered to the party's registered agent; and knowingly waives, to the fullest extent permitted by applicable law, any right it may have to a trial by jury in respect of any proceedings relating to this Agreement. Nothing in this Agreement precludes either party from bringing proceedings in any other jurisdiction to enforce any judgment obtained in any proceedings referred to in this section, nor will bringing of such enforcement proceedings in any one or more jurisdictions preclude the bringing of enforcement proceedings in any other jurisdiction.

(n) <u>Prior Agreements</u>. Beginning on the In-Service Date and for the duration of the applicable terms, the Service Fees as set forth in the Prior Agreements shall be $0.00.

[*Signature page follows*.]

IN WITNESS WHEREOF, the Parties have executed this Agreement as of the date first set forth above:

**CRUSOE**

CRUSOE ENERGY SYSTEMS INC.

By: *Cully Cavness*
Name: Cully Cavness
Title: President

**COMPANY**

GONDOLA RESOURCES, LLC

By: *Brad Morse*
Brad Morse, President

MODIIN ENERGY NPB, LLC

By: _____
Yaniv Friedman, CEO

*Signature Page to*
*Digital Flare Mitigation System Agreement*