# Exhibit A-1

Exhibit 1 to Aalok Sharma Supplemental Declaration

```
STATE OF NORTH DAKOTA                    IN DISTRICT COURT

COUNTY OF BURLEIGH           SOUTH CENTRAL JUDICIAL DISTRICT


ALKANE MIDSTREAM, LLC,        )
                              )
          Plaintiff,          )
                              )
     vs.                      )  Case No. 08-2021-CV-01257
                              )
GUILLERMO BARRETO, ET AL.,    )
                              )
          Defendants.         )




                         CIVIL HEARING
                           VIA ZOOM



                            Before
                 The Honorable Bobbi L. Weiler
                         District Judge



                   Monday, August 30, 2021
                   Morton County Courthouse
                     Mandan, North Dakota
```

                                                    **Exhibit 1**
                                                 **08-2021-cv-01257**

```
 1      Q.   (MR. SHARMA CONTINUING:)  As you look at plaintiff's
 2   -- document that's been previously marked as Exhibit 4, does
 3   it appear to be authentic to you?
 4      A.   It is.
 5      Q.   And you mentioned several documents that are part of
 6   the on-boarding process that would be going through the
 7   system.  Is the employment agreement here?
 8      A.   It is.
 9           MR. SHARMA:  Your Honor, we'd move to offer
10   Plaintiff's Exhibit 4 into evidence.
11           THE COURT:  All right.  Ms. Conroy, any objections?
12           MS. CONROY:  No, not to Plaintiff's Exhibit 4.
13           THE COURT:  Mr. Ripley, any objections?
14           MR. RIPLEY:  No, Your Honor.
15           THE COURT:  Oh, sorry.  Mr. Forward?
16           MR. FORWARD:   (Shakes head.)
17           THE COURT:  No?  Okay.  Court will admit Exhibit 4.
18      Q.   (MR. SHARMA CONTINUING:)  Now, Mr. -- Mr. Ryan --
19   Mr. Blazei, can you repeat, you said that there was an
20   employment agreement here on this form?
21      A.   Yes.
22      Q.   And where is it specifically listed?
23      A.   Can you scroll down a little further?
24      Q.   Yeah.
25      A.   It is the fourth from the bottom.
```

```
 1        Q.   Is it the fourth on the bottom?
 2        A.   Fourth from the bottom.
 3        Q.   Fourth from the bottom?
 4        A.   Yep.
 5        Q.   If you want -- there, you can drive if you'd like,
 6   Mr. Blazei.
 7        A.   Yeah.
 8        Q.   Or I'll let you drive.
 9        A.   No problem.
10        Q.   Can you -- for the -- can you show for the Court
11   where it is?  With the mouse, please.
12        A.   Right here (indicating.)
13        Q.   And what does that line item say?
14        A.   It's Alkane new employee employment agreement, and
15   then it's got the date of March 5, 2020, 12:44 p.m.  You can
16   see the timestamps consistent with when he -- when Memo also
17   agreed to the background check, the distracted driving
18   policy, his -- you know, various other documents.
19             And also over on the second column from the right, it
20   shows the last time that that document was edited and by
21   whom, and you can see that it has not been edited since he
22   executed it, and the 0CL101036, that's his user -- unique
23   username in the Paycom system.
24        Q.   And how do you know that's the unique username in the
25   Paycom system?
```

```
 1        A.   If you scroll back up to the top, you'll see that his
 2   employee number is 1036, which matches the last four, and our
 3   company code is 0CL10, which you see at the top up here under
 4   Alkane Midstream.
 5        Q.   Excellent.  Thank you.
 6             MR. SHARMA:  Now, Your Honor, I'm going to direct the
 7   Court to another document.
 8        Q.   (MR. SHARMA CONTINUING:)  Now, you referenced the
 9   employment agreement.  Is this the employment agreement that
10   you referenced, Ryan?
11        A.   It is.
12        Q.   And how do you know -- and how are you familiar with
13   this employment agreement?
14        A.   I was involved in drafting it, and also after each
15   employee signs it, we -- we download it, print it, and then I
16   execute the -- the employer's portion.
17        Q.   And just to confirm -- you know, I'll scroll at the
18   bottom here.
19        A.   So there's -- anything printed in there is prefilled
20   by our -- by our payroll system.  So you can see his name,
21   his address, that all matches with what is in our Paycom HRIS
22   system.  And then we have an e-signature, where you can see
23   -- the employees have a few options to pick the script that
24   they would like to use, and then above the name there's an
25   encryption key that on the Paycom database, on their end,
```

```
 1   they can tie back to authenticate the document.
 2        Q.   Is that your signature on this page?
 3        A.   It is.
 4        Q.   Does this document appear to be authentic?
 5        A.   Yes.
 6        Q.   Is this document -- be something that would be kept
 7   in the ordinary course of business?
 8        A.   Yes.
 9             MR. SHARMA:  Your Honor, we'd move to have Exhibit 1
10   entered -- Plaintiff's Exhibit 1 entered into evidence,
11   please.
12             THE COURT:  Ms. Conroy?
13             MS. CONROY:  Yes, Your Honor.  We object to this
14   particular document.  We do not believe that this is the
15   original or authenticated document for Mr. Barreto.  And
16   additionally, we are holding them to the best evidence rule.
17   We have requested -- when you do a digital signature, it
18   comes with a verification document.  We have requested that
19   document multiple times, it has never been produced.
20             And if it was, in fact, kept according to a SaaS, or
21   a Software-as-a-Service, such as Paycom, it would have been
22   very easy to get the authenticated document for this.  That
23   has never been produced, therefore we object.
24             THE COURT:  Mr. Sharma?
25             MR. SHARMA:  Yeah.  So, Your Honor, under Rule 901 of
```

1  the North Dakota Rules of Evidence, I only have to produce
2  someone who has knowledge of what the document is and what it
3  purports to be.  At this point, we have met that burden.
4  Mr. Ryan Blazei here has testified that this document came
5  from Alkane's system, he testified to the process of how
6  those signatures were obtained, and he testified that this
7  document was kept in the ordinary course of business, and
8  that it is authentic.
9       We have met our burden for this to be admitted.  Now,
10 I understand Ms. Conroy's objections as to authenticity, but
11 that does not go to admissibility, that goes to the weight of
12 the evidence.
13      THE COURT:  Mr. Ripley, any other -- or any objection
14 from you?
15      MR. RIPLEY:  Yeah.  I just concur with Ms. Conroy's
16 objection.
17      THE COURT:  The objection is noted and overruled.
18 The Court will admit Exhibit 1.
19   Q.  (MR. SHARMA CONTINUING:)  Ryan, you stated that you
20 were familiar with this employment agreement.  Is this
21 employment agreement standard for all employees?
22   A.  It is.
23   Q.  And what does this employment agreement typically do?
24   A.  Basically it's a protection of Alkane work product
25 and -- and disparagement.  So we ask employees not to

   1    generation.  We were pretty caught off guard, and I was just

   2    trying to think, like, okay, this is a bit of a surprise, is

   3    there any way to -- disappointed to hear the news, but is

   4    there any way to make some lemons out of this lemonade and

   5    can we work with Arugadi to incorporate them in some of our

   6    projects that we're actively pursuing?

   7          And that's when he shared that in addition to

   8    Arugadi, that Baker Consulting had also recently agreed to

   9    contract -- have -- subcontract underneath them, a different

 10    power generation provider, Tractor and Equipment, the CAT

 11    dealer in the Williston area, and that he did not think

 12    partnering would be possible because of that.

 13          And -- and then after -- and then from there, that

 14    was, again, another -- a pretty big shock because, you know,

 15    T&E was not only a vendor to Alkane, but also could be a

 16    competitor at times.  So clearly, you know, something didn't

 17    smell right.  And after -- after he left -- again, he turned

 18    in his resignation, he was heading off for a vacation.

 19          We quickly decided to email a couple projects that we

 20    had been involved in with -- with Mr. Barreto and followed up

 21    to see kind of how those things -- how those projects were

 22    sitting, because we believed they were close to completion.

 23          THE COURT:  If I can just interrupt for a minute.

 24    Can you spell the name of the company that told you that they

 25    couldn't work with you?

```
 1              MR. BLAZEI:  So it was Arugadi, so it's
 2    A-r-u-g-a-d-i, I believe, Organics.  That's -- and -- and,
 3    Your Honor, how it works is when you're on the Fort Berthold
 4    Indian Reservation, if you're not a native-owned company,
 5    they have a tiered structure.  And so to do work on the
 6    reservation, you need to subcontract underneath a Tier 1
 7    provider.
 8              So Baker Consulting would be a -- would be a
 9    native-owned company.  They could have subcontractors
10    underneath of them.  Alkane subcontracts under AH Inc., which
11    was the former owner of AH Power, and thus if Baker was to
12    have another power provider as their subcontractor, it's my
13    understanding that they cannot have a second power contractor
14    underneath them.  They can only have one.  And likewise, we
15    are -- we're contracted under AH Inc., I could not be
16    contracted under AH Inc. and Baker Consulting at the same
17    time for the same services.
18              THE COURT:  Okay.  Thank you.
19       Q.   (MR. SHARMA CONTINUING:)  You mentioned that you
20    followed up with some customers.  Can you explain your --
21    your sort of interactions with those customers?
22       A.   Yeah.  So Memo was -- or Mr. Barreto was very -- we
23    were very close on -- as Alkane, a project with XTO Energy.
24    In fact, Mr. Barreto put a lot of pressure on Tom Cuthbert,
25    our general counsel, and I the week before to get a legal
```

```
 1   document done and back to XTO because we were very close to
 2   making a decision.  So we got that legal document done and
 3   then we didn't hear anything for a few days.
 4          So I followed up to that email to the XTO team to
 5   say, hey, you know, we got that document turned around for
 6   you guys last week.  It seemed like everything was very close
 7   to happening.  Memo was on vacation.  I copied -- I copied
 8   Memo on the email, as -- as was standard for, you know, this
 9   project.  And I just said, you know, with him on vacation is
10   there any way that, you know, we can get an update?
11          And we didn't hear anything back, and by then we had
12   already started kind of investigating, just because of the
13   nature of the resignation, and that's when we came across an
14   email response from XTO letting us know that -- or it was
15   directly to Memo, not -- not to myself or Ed or Tom Cuthbert,
16   and letting -- asking Memo what was going on because all of
17   -- all of the documents and all of the presentations
18   internally at XTO thus far had been at Alkane, and it was
19   their understanding that -- that it was no longer going to be
20   an Alkane project.
21     Q.  And we'll get to that email later.  So after you --
22   you mentioned an investigation.  What -- can you kind of walk
23   me through the -- how did that investigation go about?  What
24   was that investigation?
25     A.  So we -- we -- we agreed Memo would go on his
```

1  vacation.  He offered two weeks of leave notice -- notice,
2  and one week of that would be his PTO time in Mexico.  So we
3  immediately started, not only reaching out to clients, but
4  then also looking at documents and our email system to see if
5  anything was going on, and that led to the discovery of a few
6  problematic emails, surprise emails.
7       And at that point, we immediately notified
8  Mr. Barreto that we would not be needing his two-week
9  resignation and that we were going to forward his phone to
10 Mr. Ed Woods, and his email as well to Mr. Ed Woods, and then
11 -- and then removing his access to our systems and files.
12    Q.  And how did you remove his access to the systems and
13 files?
14    A.  We use Microsoft Office, and so there's a feature in
15 their admin console where you can click on the user and you
16 can just log them out of all devices.  So he had a -- he had
17 a company phone with him in Mexico, he also had his personal
18 phone, and he had his laptop.  And so basically a logout just
19 means it doesn't erase any data for them, it just basically
20 logs them out of the system and doesn't allow them to log
21 back in to access your system.
22    Q.  You mentioned some of these problematic emails.  Can
23 you walk me through examples of what you found and --
24    A.  Yeah.  So unfortunately for us it went all of the way
25 back to November, mid-November of 2020.  We started finding

25

Exhibit 1
08-2021-cv-01257

```
 1   Mr. Barreto's email.
 2        Q.  And what is this email purportedly stating?
 3        A.  It's an email from Mr. Barreto to a group of
 4   investors, some familiar to Alkane, some not, about starting
 5   their own bitcoin mining operation outside of Alkane, and
 6   it's dated in December of 2020.
 7        Q.  And in relation to Mr. Barreto's resignation, when is
 8   that -- where does that fall in the timeline?
 9        A.  Approximately six months before.
10        Q.  Was Alkane reaching out to companies for this work?
11        A.  We were.  So Alkane was building their own -- our own
12   bitcoin mining servers, but also reaching out to third
13   parties to have them locate their servers, and we provide
14   power and gas services.
15        Q.  And does that appear what Mr. Barreto is doing here
16   in Plaintiff's Exhibit 10?
17        A.  Yes.
18        Q.  Can you clarify?  I'm sorry.
19        A.  Yeah.  So he -- here it appears he's -- he's --
20   instead of partnering with -- bringing on business to
21   collaborate with Alkane, it appears that he is trying to put
22   together a group to compete with Alkane to own the boxes.
23            MR. SHARMA:  Your Honor, we have -- we move to offer
24   Plaintiff's Exhibit 10 into evidence.
25            THE COURT:  Ms. Conroy?
```

```
 1            MS. CONROY:  Your Honor, I believe this was one of
 2   the stipulated exhibits.
 3            THE COURT:  Mr. Ripley?
 4            MR. RIPLEY:  No objection, Your Honor.
 5            THE COURT:  Court will admit Exhibit 10.
 6       Q.   (MR. SHARMA CONTINUING:)  So I want to rewind a
 7   little bit.  You mentioned Mr. -- Mr. Baker, you found some
 8   emails with Mr. Baker?
 9       A.   Yeah.
10       Q.   Is this -- what is this document, Ryan -- Mr. Blazei?
11       A.   It's an email from Jason Baker to Mr. Barreto dated
12   January 12 of 2021.  There's a chain of emails attached to it
13   that date all of the way back to mid-November of 2020.
14       Q.   And how are you familiar with this document?
15       A.   We discovered it as part of our investigation into
16   Mr. Barreto's email.
17       Q.   So this document was in Mr. Barreto's email?
18       A.   It was.
19       Q.   Okay.  This document appear to be authentic from what
20   you found on the system?
21       A.   It is.
22            MR. SHARMA:  Your Honor, we move to offer Plaintiff's
23   Exhibit 11.
24            THE COURT:  Ms. Conroy?
25            MS. CONROY:  Yes, Your Honor.  We vigorously object
```

1   to this.  This -- as you can see, this is from Mr. Barreto's
2   personal Hotmail account.  It is in no way, shape, or form
3   associated with Alkane, and we have reason to believe that
4   Mr. Barreto's personal email, including his Hotmail, was
5   inappropriately accessed by Mr. Blazei, therefore we object
6   to this particular document.  As you can see, it's not
7   related to Alkane at all.
8             THE COURT:  Mr. Ripley?
9             MR. RIPLEY:  I don't have anything to add, Your
10  Honor.
11            THE COURT:  Mr. Sharma?
12            MR. SHARMA:  Your Honor, this is the same exhibit --
13  the reason why Mr. Ripley had nothing to add, because it's
14  the same as Baker Consulting Exhibit A, which Ms. --
15  Ms. Conroy has already stipulated to.  So it's coming in one
16  way or the other.  And with respect to whether it is Alkane's
17  document, it's already a party admission.
18            It's clearly relevant to the issue of whether
19  Mr. Barreto was ferreting out Alkane's confidential and
20  proprietary trade secret information.  And as I noted, Mr.
21  Blazei's testified that he found this on Alkane's systems.
22            THE COURT:  So this is the same exhibit as Exhibit A?
23            MR. SHARMA:  For Baker Consulting, Your Honor.
24            THE COURT:  And that's already been admitted -- or
25  stipulated to?

```
 1            MR. SHARMA:  With respect to foundation.  So unless
 2   Ms. Conroy has other objections, it should be admissible.
 3            THE COURT:  Okay.  So you have to explain to me,
 4   though, how -- I understand the relevance.  It would be
 5   admitted based on relevance, but I don't know the foundation.
 6   If this is with his personal email, he can't lay the
 7   foundation for that.
 8            MR. SHARMA:  I can explain in further detail, Your
 9   Honor, to lay proper foundation.
10            THE COURT:  Okay.  You can ask further questions.
11       Q.  (MR. SHARMA CONTINUING:)  Okay.  Yeah.  Mr. --
12   Mr. Ryan, can you -- as you've heard from the Court, can you
13   give us an idea how you found Mr. Barreto's personal Hotmail
14   accounts on Alkane's Ecosystem -- on Alkane's servers?  I'm
15   sorry.
16       A.  Yeah.  Not an expert, but I would -- we have no
17   access to the Hotmail server or his Hotmail account.  So the
18   only way that it would be in the folders on the Alkane
19   Microsoft environment would be if Mr. Barreto saved them
20   there in a folder of his own volition.
21       Q.  And to be clear, this folder was on --
22       A.  On the Alkane servers, yes.  We have no access to his
23   personal computer or his personal email account.
24            MR. SHARMA:  Your Honor, we'd move to offer
25   Plaintiff's Exhibit 11, which is the same exhibit as Baker
```

1 about their well sites and what they were planning or not
2 planning to do with their location.
3     Q. You've had the opportunity to review Exhibit 1, which
4 I have right here, that is the employment agreement that the
5 Court has chosen to accept. When was the first time that you
6 saw this document?
7     A. I -- I -- it's -- it's been long. I know that when
8 AH Power was finalizing its sale of its business to Alkane, I
9 had a conversation with Tom Payne, and it was a very -- my
10 stance was very adamant that I would not sign a noncompete.
11 I would not join the Alkane team if I had to sign a
12 noncompete.
13     There was some back and forth email communications
14 with Mr. Blazei about my stance, and that, you know, some
15 agreement would be put in the works. I do not have
16 recollection of having signed the employment agreement ever.
17     Q. And did you at some point try to get into that
18 dashboard to see if it was, in fact, the real employment
19 agreement?
20     A. I did, but I don't -- I don't have access to it.
21 Only my pay stubs.
22     Q. You were denied access to the employment agreement on
23 your dashboard?
24     A. And other documents that I signed. I only had access
25 to pay stubs.

```
 1      Q.   Do you ever recall picking that signature?
 2      A.   No.
 3      Q.   Were you ever free to hire and fire anyone?
 4      A.   No, not really.
 5      Q.   Were you ever -- well, let me ask you this, what was
 6  Alkane's reputation when you would go talk to -- what was
 7  your perception of their -- of their reputation?
 8           MR. FORWARD:  Objection; relevancy, Your Honor.
 9           THE COURT:  Ms. Conroy?
10           MS. CONROY:  Yes, Your Honor.  It goes directly to
11  relevancy because one of the reasons that he left was because
12  of Alkane's poor reputation in the field.
13           THE COURT:  But how -- what's that have to do with
14  whether he took confidential information with him?
15           MS. CONROY:  Thank you.  I'll move on.
16           THE COURT:  Okay.
17      Q.   (MS. CONROY CONTINUING:)  I want to now talk about
18  another exhibit, which is Exhibit 11, which again the Court
19  has accepted it over our -- over our objection.  What was the
20  purpose of that email exchange?
21      A.   This was an email exchange between Mr. Baker and I.
22  My -- my family's been in the agricultural business for a
23  very long time, and I saw an opportunity to develop a brand
24  around bringing a high-value crop into North Dakota.  And so
25  this -- this email back and forth was communications with
```

1   Mr. Baker to that effect to see if we could build a brand.
2        Q.   And was the Alkane folks, so I'm talking about Ed
3   Woods and Ryan Blazei, did they know that you had side
4   projects?
5        A.   They did from the onset.  I mean, Dakota Oilfield
6   Solutions was a company that had its own MSAs, it had power
7   generation equipment, temperature control equipment.  I was
8   involved with those operations.  Alkane knew about it.  And
9   -- and, in fact, bitcoin mining, you know, I brought a few
10  potential investors to Alkane, where the idea of these
11  investors was that they would own their bitcoin mining
12  operation and Alkane would provide the power generation.
13            One of the exchanges in the emails has been
14  misconstrued to that effect, saying that, you know, I was
15  going to siphon bitcoin mining away from Alkane when, in
16  fact, it had -- extremely the opposite.  I was putting
17  together a group of investors that would invest an
18  infrastructure so that Alkane could generate power to power
19  these bitcoin mines.
20            Alkane had a money problem, a capital problem.  They
21  -- they -- they needed capital infusion.  They could not
22  create some of these components that they wanted to marry
23  through this ecosystem, and I offered to bring some investors
24  and to help some of these ecosystem components be brought to
25  reality.  This was the case with the hydropods that I